**The below described is SIGNED.**



Dated: December 09, 2010

                                    **JOEL T. MARKER**
                                  **U.S. Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

## NORTHERN DIVISION

| | |
|---|---|
| In re:<br><br>RICHARD PEWTRESS,<br><br>                           Debtor. | Bankruptcy Case No. 09-27292<br><br>Chapter 7 |
| NEIL WARD and<br>SALENA WARD,<br><br>                          Plaintiffs,<br><br>v.<br><br>RICHARD PEWTRUSS *dba*<br>TIMBERIDGE CABINETRY,[1]<br><br>                         Defendant. | Adversary Proceeding No. 09-2491<br><br>Judge Joel T. Marker |

_____

### MEMORANDUM DECISION
_____

        The Plaintiffs in this adversary proceeding, Neil and Salena Ward, seek a determination that debt owed to them by the Debtor, Richard Pewtress *dba* TimberRidge Cabinetry, relating to his fabrication and installation of cabinetry in their home is nondischargeable under 11 U.S.C.

---

[1] The Plaintiffs styled this action as *Ward v. Pewtruss*, but the proper spelling of the Debtor's surname is Pewtress. It also appears that TimberRidge is the proper spelling of the Debtor's *dba*.

1

§ 523(a)(2)(A).[2] The Court conducted a trial on December 2, 2010 and took the matter under advisement. After considering the evidence properly before the Court, assessing the credibility of the witnesses, considering the arguments of counsel, and conducting an independent review of applicable law, the Court issues the following Memorandum Decision.[3]

## I. FACTS

With one notable exception discussed below, the facts in this adversary proceeding as contained in the Final Pretrial Order and adduced at trial are largely undisputed. The Plaintiffs as owner-builders were constructing a new home in West Haven, Utah in 2007 — the second home that they have constructed as owner-builders — and were looking for a subcontractor to build their "dream kitchen" for that home. Plaintiff Salena Ward's mother knew of the Debtor, the Debtor's daughter-in-law was best friends with Salena's sister, and both Salena's mother and the Debtor's daughter-in-law spoke highly of the Debtor and his cabinetry work.

After initial telephone conversations in the fall of 2007 and the Debtor's submission of a bid for the job, Salena visited the Debtor's workshop which sits on the same property as the Debtor's home in Morgan, Utah that is owned by his wife. The Plaintiffs had narrowed their hiring decision to the Debtor and Legacy Furniture & Design (now Legacy Custom Cabinetry), and the Plaintiffs ultimately chose the Debtor to fabricate and install cabinets throughout the entire house because he would use most any wood except walnut or clear cherry without adjusting his bid price. As such, the Plaintiffs entered into an oral contract with the Debtor on or about October 22, 2007 under which the Plaintiffs agreed to pay $33,341 for the fabrication and

---

[2] All future statutory references are to title 11 of the United States Code unless otherwise indicated. The Plaintiffs originally asserted an additional cause of action under § 523(a)(6), which the Court dismissed on February 23, 2010.

[3] This Memorandum Decision constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52, made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052. Any of the findings of fact herein are also deemed to be conclusions of law and conclusions of law herein are also deemed to be findings of fact and shall be equally binding as both.

2

installation of cabinetry throughout their home with 50% paid up front and 50% to be paid upon completion. Shortly thereafter, the Plaintiffs requested from their lender Republic Mortgage that a check for $16,670.50 be drawn to the Debtor.[4]

During the discussions and negotiations that led up to the contract, the Debtor represented that (1) he had 26 years of experience in fabricating and installing cabinets; (2) his normal time frame was six to eight weeks for fabrication of the cabinets and three to five days for installation; (3) his work was "high quality"; and (4) he would not charge extra for maple. Despite the Plaintiffs' testimony that they were extremely concerned about potential construction loan penalties by their lender and legal liability as owner-builders, they never asked the Debtor whether he was licensed to install cabinets as required by the State of Utah; however, the Debtor also did not volunteer the facts that he was not licensed at the time and that he had been cited once before for failure to have an installer's license. The Plaintiffs testified that the Debtor somehow implied or led them to believe that he was licensed through his silence, his behavior, and/or an unspecified plaque on the wall of his workshop. The Debtor testified that he had almost completed all the licensure requirements at the time he contracted with the Plaintiffs. Overall, the Plaintiffs' project had over 20 subcontractors for which the Plaintiffs, particularly Salena, interviewed several people in great detail for each position.

The major factual dispute in this adversary proceeding involves the species of wood that were supposed to be used, particularly for the kitchen cabinets, versus the species of wood that were actually used. Although the contract was entered into in October, the final decisions about which woods would be used to construct the cabinets were not finalized until November after extensive discussions between Salena and the Debtor. Salena was very clear at trial about the fact that she wanted most of the kitchen's woodwork, including the cabinets, done in maple with

---

[4] Exs. 3 and 7.

3

an antique finish although some other pieces would be made of other woods. The Debtor testified that Salena had originally requested alder because she could not afford maple but that he suggested Pacific coast maple instead. Ultimately, both sides agree that maple was to be a large part of the kitchen cabinetry although the evidence was unclear as to whether any particular type of maple was required.[5]

The Debtor had two employees at the time of this contract, and they began fabricating the cabinets in November. Salena contacted the Debtor frequently after the contract date to keep the Debtor apprised of the home construction's status. On or about December 5, Salena called the Debtor to let him know that the Plaintiffs' home would not be ready for cabinet installation until mid-to-late February. The Debtor testified that he had anticipated the installation to occur in December and that he became concerned because his next job was not until January. Needing the work and thinking that time was not an issue, the Debtor took on two more jobs for a general contractor that shortly thereafter filed for bankruptcy and caused the Debtor to sustain substantial losses that required him to terminate his employees.

Now working alone and short on cash, the Debtor explained his circumstances to the Plaintiffs and asked them for a $5,200 advance on the remaining 50% of the contract price to buy the rest of the materials to complete their job, which the Plaintiffs paid on or about February 9, 2008.[6] But despite the Plaintiffs' growing concern, the Debtor still did not have the cabinetry fully finished and installed by April 22, 2008 even though he had begun the installation around February 20, 2008. Meanwhile, the Plaintiffs' construction loan had matured on March 29, and

---

[5] A kitchen cabinet door constructed by the Debtor's workshop and from the Plaintiffs' home was brought into court and referenced at trial by several witnesses but was neither offered nor received into evidence. But even if it had been received, the witnesses disputed whether that door was made of Pacific coast maple, poplar, or some other wood or whether it was even possible to tell from the sample at issue.
[6] Ex. 4.

4

they had to pay their lender for an extension.[7] And as early as March 16 the Debtor sent the Plaintiffs a fax admitting some fault in the matter, referring to the whole situation as a "blood bath," and stating the following as one of two possible solutions: "1) Let me hire a licensed installer and finish the job. This is absolutely legal. If I had hired an installer, we might not be at this juncture."[8]

Apparently not reading this as an admission of the Debtor's lack of licensure, Salena did not contact the Utah Department of Commerce's Division of Occupational & Professional Licensing (DOPL) until April 22, at which point she learned that the Debtor was not licensed. She also contacted Graham Spedding of Legacy Furniture & Design on April 22 to provide his opinion of the Debtor's work, and he found the work to be substandard in many respects.[9] The Plaintiffs went to the Debtor's home the next day with the police to collect their remaining materials from his workshop, but the police did not require any such turnover and instructed the Plaintiffs to deal with this matter in civil proceedings.[10]

The Plaintiffs' counsel then sent the Debtor a demand letter on May 9,[11] and the Plaintiffs pursued legal action against the Debtor on two fronts. First, DOPL cited the Debtor on May 15 for installing cabinets without a license to which he admitted and for which he was fined and ordered to cease and desist in June.[12] The Utah Department of Commerce's Division of Consumer Protection also pursued administrative action against the Debtor which resulted in the issuance of Findings of Fact and Conclusions of Law on March 2, 2009 concluding that the

---

[7] Ex. 5.
[8] Ex. 6.
[9] Ex. 22. The Plaintiffs also subsequently contracted with him to fix and otherwise complete the Debtor's work.
[10] Ex. 12.
[11] Ex. 8.
[12] Exs. 11, 14, and 15.

Debtor knowingly, but not intentionally, used at least some wood other than maple as required by the contract and thus violated UTAH CODE ANN. § 13-11-4(2)(b).[13]

Second, in addition to these administrative actions, the Plaintiffs sued the Debtor in Second District Court on June 13, 2008 asserting numerous causes of action.[14] The Second District Court issued summary judgment in the Plaintiffs' favor on December 17, 2008, apparently on a default basis, and the relevant record in this adversary proceeding only consists of Salena's Affidavit in Support of Motion for Summary Judgment,[15] the Second District Court docket sheet,[16] and the Judgment itself which does not indicate its specific factual or legal bases.[17] A supplemental proceeding was scheduled for April 15, 2009, but the Debtor failed to appear and a bench warrant was issued.[18]

In addition to considering enforcement of the bench warrant and attachment of the Debtor's personal property as part of their collection efforts, the Plaintiffs also considered asserting a state law fraudulent transfer action against the Debtor's wife for the early 2007 transfer of the Morgan home from the Debtor to his wife. Between April 1, 2009 and July 15, 2009, the parties — both directly and through counsel — exchanged numerous e-mails including settlement offers and counteroffers.[19] The last such offer by the Debtor came on June 17, 2009 in the form of a proposal to use the proceeds from the sale of his wife's home to pay the Plaintiffs, to which the Plaintiffs counteroffered as to the payoff structure on June 30, 2009 then did not hear anything substantive again until after the Debtor had filed for bankruptcy on July 13,

---

[13] Exs. 1 and 13.
[14] Exs. 16 and 17.
[15] Ex. 2.
[16] Ex. 17.
[17] Ex. 18. It appears from the docket sheet (Ex. 17) that although the Order Granting Plaintiffs' Motion for Summary Judgment was entered on December 17, 2008, the Judgment was not separated as an independent document and entered as such until April 3, 2009.
[18] Exs. 19 and 21.
[19] Ex. 20.

6

2009.[20] The bench warrant had been cancelled on June 2, 2009,[21] apparently because the Debtor provided the Plaintiffs with sufficient Interrogatories as to his assets,[22] and the Plaintiffs never attached the Debtor's personal property or filed a fraudulent transfer action against the Debtor's wife as to the Morgan home.

## II. DISCUSSION

The exceptions to discharge contained in § 523(a) "are to be narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the debtor's favor."[23] "In order to establish a non-dischargeable claim under [§ 523(a)(2)(A)], a creditor must prove the following elements by a preponderance of the evidence: '[1] The debtor made a false representation; [2] the debtor made the representation with the intent to deceive the creditor; [3] the creditor relied on the representation; [4] the creditor's reliance was [justifiable]; and [5] the debtor's representation [proximately] caused the creditor to sustain a loss.'"[24]

As to the second element of the § 523(a)(2)(A) test, intent to deceive need not be shown by direct evidence but may be inferred from the totality of the circumstances and includes reckless disregard of the truth.[25] That said, the "mere inability or failure to perform is not, in itself, sufficient evidence of fraudulent intent."[26] As to the third and fourth elements, the justifiable reliance standard "is not 'reasonableness' in the sense of whether an objectively reasonable person would have relied upon the debtor's false representations. Rather, the inquiry is whether the actual creditor's reliance was 'justifiable' from a subjective standpoint. In

---

[20] *Id.* The Debtor testified that he had made the final offer before consulting with his wife about the distribution of the home sale proceeds and that, when he did discuss it with her, she strongly opposed the idea.
[21] Ex. 17.
[22] Ex. 20.
[23] *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997).
[24] *In re Riebesell*, 586 F.3d 782, 789 (10th Cir. 2009).
[25] *In re Daviscourt*, 353 B.R. 674, 685 (10th Cir. BAP 2006); *see also Riebesell*, 586 F.3d at 791.
[26] *In re Carlson*, 381 B.R. 417 at *3 (10th Cir. BAP 2008) (table decision).

determining whether a creditor's reliance was justifiable, a court should therefore examine the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than applying a community standard of conduct to all cases. Even under the justifiable test, however, the plaintiff must use his senses and at least make a cursory examination or investigation of the facts of the transaction before entering into it. Moreover, this test does not leave objective reasonableness irrelevant, for the greater the distance between the reliance claimed and the limits of the objectively reasonable, the greater the doubt about reliance in fact. In effect, reasonableness goes to the probability of actual reliance."[27]

And although § 523(a)(2)(A) generally requires false representations as to past or current facts rather than promises related to future actions, "a debtor's misrepresentation of his intentions may constitute a false representation within the meaning of [§ 523(a)(2)(A)] if when the representation was made the debtor had no intention of performing as promised."[28] "To qualify as an affirmation of fact, a statement must be objective in nature, i.e., verifiable or capable of being proven true or false. Similarly, to be relied upon as a promise, a statement must be highly specific or definite."[29]

Finally, "[i]ssue preclusion, also referred to as collateral estoppel, prevents parties or their privies from relitigating issues which were once adjudicated on the merits and have resulted in a final judgment. In order for issue preclusion to apply, four elements must be present: [1] the party against whom issue preclusion is asserted must have been a party to or in privity with a party to the prior adjudication; [2] the issue decided in the prior adjudication must be identical to the one presented in the instant action; [3] the issue in the first action must have been completely, fully, and fairly litigated; and [4] the first suit must have resulted in a final judgment on the

---

[27] *Riebesell*, 586 F.3d at 791-92 (internal quotes and citations omitted).
[28] *In re Jacks*, 415 B.R. 536, 539 (Bankr. D.N.M. 2008); *see also Carlson*, 381 B.R. 417 at *3.
[29] *Boud v. SDNCO, Inc.*, 54 P.3d 1131, 1135 (Utah 2002) (describing puffery).

merits . . . . The burden of establishing each of the elements of [issue preclusion] is on . . . the party invoking the doctrine . . . ."[30] Default judgments are generally not granted preclusive effect because none of the issues was actually litigated.[31]

## A.     Initial Contract

The Plaintiffs have placed the Debtor's alleged false representations into three different groups, and the Court will analyze each group in turn. First, the Plaintiffs argue that the Debtor's representations in connection with the original October 2007 contract were false and actionable under § 523(a)(2)(A). The Court disagrees. There was no evidence that the Debtor did not actually have 26 years of experience in fabricating and installing cabinets, that he charged the Plaintiffs extra for maple, or that his normal time frame for job completion was not actually six to eight weeks for cabinet fabrication and three to five days for installation. On the last point, the Debtor credibly explained the series of events that led to his delays in completing the Plaintiffs' job, and the mere failure to perform under these circumstances is not sufficient evidence of fraudulent intent. The Debtor's representation that his work was "high quality" is a classic example of puffery, not an objectively verifiable fact upon which any reliance can be placed, nor did the Plaintiffs challenge the general truth of that representation.[32]

The two other alleged representations at the time of contracting involved the Debtor's licensure and what type of wood would be used to construct the cabinetry. As to the fact that the Debtor was not licensed to install cabinetry at the time he contracted with the Plaintiffs, the evidence shows that the Debtor made no representation either express or implied on the issue. It

---

[30] *Zufelt v. Haste, Inc.*, 142 P.3d 594, 597 (Utah App. 2006).
[31] *In re Jordana*, 216 F.3d 1087 at *1 (10th Cir. 2000) (table decision).
[32] *See Boud*, 54 P.3d at 1135. Salena also testified briefly that the Debtor offered a lifetime warranty on his work, and the Debtor briefly testified that he did not and never would make such a promise. This alleged representation was not effectively pursued at trial as a basis for holding the Plaintiffs' debt nondischargeable, and in any event the Court finds insufficient evidence to establish any reliance on the representation or whether it even occurred.

is true that material omissions may support a § 523(a)(2)(A) action in appropriate circumstances.[33] But "[i]n order to meet [their] burden on the issue of fraudulent non-disclosure, [the Plaintiffs] must have established that [the] Debtor had a duty to disclose material information and failed to do so. A party to a transaction has a duty to disclose material facts that in equity or good conscience should be disclosed. Often, that duty is derived from the nature of the parties' relationship, particularly when their relationship is one of trust and confidence between them. Such a 'confidential relationship' may be found where (1) one party has taken steps to induce another to believe that it can safely rely on the first party's judgment or advice; (2) one party has gained the confidence of the other and purports to act or advise with the other's interest in mind; or (3) the parties' relationship is such that one is induced to relax the care and vigilance that ordinarily would be exercised in dealing with a stranger."[34] These principles must also be considered in connection with the principles that reliance on either affirmative representations or material omissions must be both actual and justifiable.

Importantly in this adversary proceeding, the Plaintiffs failed to even take the cursory step of asking the question of whether the Debtor was licensed to install cabinetry in their new home. This is particularly curious in light of the Plaintiffs' repeated testimony that subcontractor licensing was very important to them as owner-builders and in light of the fact that this is the Plaintiffs' second owner-built home. So although the Debtor's failure to disclose his unlicensed status, even though he was allegedly on the verge of completing the licensing requirements, is not to be commended, the Debtor made no representation on which the Plaintiffs could actually rely and any such reliance would not be justifiable under the circumstances.[35]

---

[33] *Daviscourt*, 353 B.R. at 685.
[34] *In re Blatzer*, 438 B.R. 354 at *5 (10th Cir. BAP 2010) (table decision).
[35] *Contrast In re Pleasants*, 219 F.3d 372 (4th Cir. 2000).

Finally, as to the species of wood used by the Debtor, the Plaintiffs have failed to show that the Debtor intended to deceive them when he entered into the contract (or any point thereafter). Although the Division of Consumer Protection (DCP) concluded that the Debtor knowingly used at least some wood other than maple as required by the contract and thus violated UTAH CODE ANN. § 13-11-4(2)(b), the DCP also concluded that the Debtor's use of non-conforming wood was unintentional. The Second District Court Judgment also does not assist the Plaintiffs because the matter was resolved as a default judgment, preventing the application of issue preclusion, and there is an insufficient record before this Court in any event to determine the specific factual and legal bases for the Second District Court's ruling. There was also inconsistent testimony at trial as to the type of wood used to construct the door that was discussed but never offered into evidence. And even if that door were made of a material other than maple, evidence of the Debtor's fraudulent intent is still lacking. Accordingly, the Court concludes that the Debtor's representations at the time of contracting do not support the Plaintiffs' § 523(a)(2)(A) action.

**B.    $5,200 Advance**

The second set of alleged false representations involved the Debtor's request in early February 2008 for an additional $5,200 advance on the remaining 50% of the contract price that the Plaintiffs owed the Debtor. But as discussed above, the Court finds that the Debtor's explanation of the events that led to the request is reasonable and does not show fraudulent intent. After Salena informed the Debtor that the Plaintiffs' cabinets would not be ready for installation until mid-to-late February, the Debtor needed additional income and thought that he had substantial time to take on two additional jobs. Unfortunately, the general contractor on those jobs declared bankruptcy, and the Debtor experienced a severe financial loss that led to

11

termination of his employees. The Court also finds that the Debtor accurately explained to the Plaintiffs why he needed the money and adequately explained the nature of how his work was financed. As such, these representations also do not form the basis of a § 523(a)(2)(A) action.

## C.     Forbearance

The last set of representations involved the Debtor's repeated prepetition promises to settle the matter with the Plaintiffs, promises on which the Plaintiffs allegedly relied to forbear from taking further collection actions against the Debtor and his wife. As an initial matter, there is some debate in the case law as to whether a creditor's forbearance from collecting an existing debt can itself be considered an "extension" of credit for purposes of § 523(a)(2)(A).[36] Assuming *arguendo* that forbearance from collection can qualify as the requisite "extension" of credit, the circumstances of this adversary proceeding do not support a § 523(a)(2)(A) action on that basis.

Specifically, the Plaintiffs allege that they cancelled their bench warrant, did not attach the Debtor's personal property, and did not sue the Debtor's wife in a fraudulent transfer action based on the Debtor's repeated promises of settlement. Although the Debtor certainly wanted to avoid having a sizeable judgment hanging over his head and filing for bankruptcy, there is no evidence that he proposed settlement with the intent to deceive the Plaintiffs.[37] Moreover, the Plaintiffs never actually accepted any of his settlement offers. The Debtor's last prepetition offer was the closest to being accepted but still received a counteroffer regarding the particulars of how the settlement payments would be structured. It also does not appear that the Plaintiffs' reliance on any settlement offers was subjectively justifiable by this point in the parties'

---

[36] *See, e.g., In re Singh*, 433 B.R. 139, 162 at n. 27 (Bankr. E.D. Pa. 2010) (collecting cases).

[37] There is some question as to the Debtor's ability to effectuate some of his settlement offers, particularly the last prepetition settlement offer that he made before discussing the proposal with his wife who actually owned the home, but the Court does not find under the circumstances that this sufficiently demonstrated an intent to deceive.

12

rancorous relationship, the bench warrant appears to have been cancelled because the Debtor supplied written Interrogatories as to his assets rather than because settlement was being pursued, and the Plaintiffs have still never taken any action against the Morgan home owned by the Debtor's wife.

### III. CONCLUSION

Although the Court certainly appreciates the Plaintiffs' years-long frustration and wishes them well moving forward with their family in their new home, the Plaintiffs have simply failed to meet their burden to show that the Debtor's conduct supports a nondischargeability cause of action under § 523(a)(2)(A). Accordingly, the Court determines that the Debtor's debt to the Plaintiffs is dischargeable, and this adversary proceeding is DISMISSED. A separate Order will be issued in accordance with this Memorandum Decision.

---------------------------------------------END OF DOCUMENT---------------------------------------------

ORDER SIGNED

\_\_\_\_\_ooo0ooo\_\_\_\_\_
## SERVICE LIST

Service of the foregoing **MEMORANDUM DECISION** will be effected through the Bankruptcy Noticing Center to each party listed below.

Lorraine P. Brown
Smith Knowles, PC
4723 Harrison Blvd., Suite 200
Ogden, UT  84403
 *Counsel for Plaintiffs*

Ted K. Godfrey
2668 Grant Avenue, Suite 105
Ogden, UT  84401
 *Counsel for Debtor*